# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  sw-19-323 |
| | ) | |
| DELL LATITUDE E7450 LAPTOP | ) | |
| SERVICE TAG 18M8282, GSAID A006791, | ) | |
| CURRENTLY LOCATED AT 409 3rd STREET, S.W. | | |
| WASHINGTON, D.C  UNDER RULE 41 | | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

a Dell Latitude E7450 laptop computer, assigned Service Tag 18M8282 and GSAID A006791 stored at the GSA-OIG National Capital Region, Office of Investigations, located at 409 3rd Street, S.W., Suite 300, Washington, D.C. (see attachment A).

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

evidence of violations of 18 U.S.C. §§ 371 (Conspiracy), 201 (Bribery), 1343 (Wire Fraud), and 1001 (False Statements) (see Attachment B).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 201, 1343, 1001 | Conspiracy, Bribery, Wire Fraud, False Statements |

The application is based on these facts:

See Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Patrick S. McCarthy, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____09/06/2019_____

_____
*Judge's signature*

City and state:  Washington, D.C.

US Magistrate Judge, Robin M. Meriweather
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   sw-19-323 |
| IN THE MATTER OF THE SEARCH OF | ) | |
| DELL LATITUDE E7450 LAPTOP | ) | |
| SERVICE TAG 18M8282, GSAID A006791, CURRENTLY LOCATED AT 409 | ) | |
| 3rd STREET, S.W., WASHINGTON D.C  UNDER RULE 41 | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

a Dell Latitude E7450 laptop computer, assigned Service Tag 18M8282 and GSAID A006791 stored at the GSA-OIG
National Capital Region, Office of Investigations, located at 409 3rd Street, S.W., Suite 300, Washington, D.C. (see
attachment A).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

evidence of violations of 18 U.S.C. §§ 371 (Conspiracy), 201 (Bribery), 1343 (Wire Fraud), and 1001 (False Statements)
(see Attachment B).

**YOU ARE COMMANDED** to execute this warrant on or before        September 20, 2019        *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.       ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
                                                                                            *(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)*   ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      09/06/2019 12:00 pm _____        _____
                                                                                                      *Judge's signature*

City and state:      Washington, D.C. _____        US Magistrate Judge, Robin M. Meriweather
                                                                                                      *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    sw-19-323 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____          _____
                                                                    *Executing officer's signature*

                                                                    _____
                                                                    *Printed name and title*

## ATTACHMENT A

### *Property to be searched*

The property to be searched is a Dell Latitude E7450 laptop computer assigned Service Tag 18M8282 and GSAID A006791, which is the GSA LAPTOP that was assigned to former GSA employee Ronnie Simpkins.  The GSA LAPTOP currently is located at GSA-OIG, 409 3rd Street, S.W., Washington, D.C.

## ATTACHMENT B

### *Property to be seized*

1.        The items, information and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 371 (Conspiracy), 201 (Bribery), 1343 (Wire Fraud), and 1001 (False Statements), including, but not limited to,

      a.  records and information concerning Mary Hay, James Rivera, Lani Hay, International Development & Resources, Inc. (hereinafter, "IDR"), Blak Lava, and Lanmark Technologies, Inc.;

      b.  communications by, between or among, Ronnie Simpkins, Mary Hay, James Rivera or Lani Hay;

      c.  records and information relating to a conspiracy to defraud the General Services Administration ("GSA") and the United States;

      d.  records and information relating to IDR's GSA contracts, including contract files, contracts, subcontracts, agreements, solicitations, offers, costs, pricing, invoices, statements of capabilities, expense reports, and revenue reports, activity reports, schedules, or work objective plans;

      e.  records and information relating to Blak Lava's GSA contracts, including contract files, contracts, subcontracts, agreements, solicitations, offers, costs, pricing, invoices, statements of capabilities, expense reports, and revenue reports, activity reports, schedules, or work objective plans;

      f.  records and information relating to Lanmark Technologies, Inc.'s GSA contracts, including contract files, contracts, subcontracts, agreements, solicitations, offers, costs, pricing, invoices, statements of capabilities, expense reports, and revenue reports, activity reports, schedules, or work objective plans;

      g.  correspondence between IDR principals, employees, contractors, subcontractors and GSA officials, employees, or contractors involved in the award, administration, or review of GSA contracts;

h.   correspondence between Blak Lava principals, employees, contractors, subcontractors and GSA officials, employees, or contractors involved in the award, administration, or review of GSA contracts;

i.   correspondence between Lanmark Technologies, Inc. principals, employees, contractors, subcontractors and GSA officials, employees, or contractors involved in the award, administration, or review of GSA contracts;

j.   records and information that constitute evidence of use and control over the GSA LAPTOP;

k.   records and information that constitute evidence of the state of mind of Mary Hay, James Rivera, Lani Hay and Ronnie Simpkins, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

l.   records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with Mary Hay, James Rivera, Lani Hay, Ronnie Simpkins or C.B. about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts; and

m.   records and information relating to the business operation and management of IDR's systems, including personnel records, articles of incorporation, organization charts, company reports, resumes, appointment books, meeting notes, pay statements, Forms W-2, Forms 1099, tax records, and other records relating to contractor payments, employment and contractor agreements, ledgers, and financial documents.

n.   evidence of the attachment to the GSA LAPTOP of other storage devices or similar container for electronic evidence;

o.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the GSA LAPTOP;

p.   evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

q.   evidence of the times the GSA LAPTOP was used;

r.   passwords, encryption keys, and other access devices that may be necessary to access the GSA LAPTOP;

s.   documentation and manuals that may be necessary to access the GSA LAPTOP or to conduct a forensic examination of the GSA LAPTOP;

t.   records of or information about Internet Protocol addresses used by the GSA LAPTOP; and

u.   records of or information about the GSA LAPTOP's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF
DELL LATITUDE E7450 LAPTOP
SERVICE TAG 18M8282, GSAID
A006791, CURRENTLY LOCATED AT
409 3rd STREET, S.W., WASHINGTON
D.C UNDER RULE 41

SW No. 19-323 _____

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Patrick S. McCarthy, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of a digital device, that is

a laptop computer ("GSA LAPTOP") as described in Attachment A, which currently is in law

enforcement possession, and the extraction from that property of electronically stored information

as described in Attachment B.

2.      I am a Special Agent with the General Services Administration ("GSA"), Office of

Inspector General ("OIG").  I have been employed in this position for approximately five years

during which time I have been trained at the Federal Law Enforcement Training Center

("FLETC"), Glynco, GA.   Prior to this position, I served as a police officer for the United States

Park Police for approximately four years during which time I also was trained at the FLETC.  As

a federal agent, I am authorized to investigate violations of the laws of the United States, and as a

law enforcement officer, I am authorized to execute warrants issued under the authority of the

United States.  I also am authorized to conduct investigations related to programs, operations and

contracts with GSA and to exercise all duties and authorities incident thereto, including the

authority to carry firearms, make arrests, execute search warrants, serve subpoenas, administer oaths, obtain records and information, and undertake other duties as necessary in support of the mission of the Office of Inspector General.  I have led, and participated in, numerous investigations involving fraud against the U.S. Government.

3.     The facts and information in this affidavit are based on my personal observations, my knowledge of the investigation, information obtained from other agents, witnesses and agencies, and information obtained from interviews and analysis.  When I specify that a communication or event occurred on a specific date, it should be construed that the communication or event occurred on or about the date specified.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 371 (Conspiracy), 201 (Bribery of Public Official), 1001 (False Statements), and 1343 (Wire Fraud), have been committed by Ronnie Simpkins, Mary Hay, James Rivera and International Development & Resources, Inc.  There also is probable cause to search the GSA LAPTOP, further described in Attachment A, for the things described in Attachment B.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.     The property to be searched is a Dell Latitude E7450 laptop computer, assigned Service Tag 18M8282 and GSAID A006791, that is the GSA LAPTOP, which GSA had assigned to former employee RONNIE SIMPKINS.

6.      The GSA LAPTOP currently is in the lawful possession of the GSA and is stored at the GSA-OIG National Capital Region, Office of Investigations, located at 409 3rd Street, S.W., Suite 300, Washington, D.C.

7.      GSA seized the laptop from its workspace at 1800 F Street, N.W., Washington, D.C.  Therefore, while GSA already might have all necessary authority to examine the GSA LAPTOP, I seek this additional warrant out of an abundance of caution to be certain that an examination of the GSA LAPTOP will comply with the Fourth Amendment and other applicable laws.

## INDIVIDUALS AND ENTITIES

8.      This investigation is being conducted jointly with the Federal Bureau of Investigation (FBI).  GSA is an executive agency with its headquarters located at 1800 F Street, N.W., Washington, D.C. GSA's Public Building Service provides workspaces by constructing, managing, and preserving government buildings and by leasing and managing commercial real estate. GSA's Federal Acquisition Service offers to government organizations and the military, solutions provided by private sector professional services, equipment, supplies, and information technology ("IT").

9.      **Ronnie Simpkins** (hereinafter "SIMPKINS") was employed by GSA as a Contracting Officer assigned to GSA's headquarters in Washington, D.C.   SIMPKINS held procurement related positions at GSA from July 16, 1989, until his abrupt and immediate retirement on May 28, 2019.  SIMPKINS was assigned to a sub-division of the Federal Acquisition Service, which oversees the administration of GSA Schedule 70 contracts.  "Schedules" are long-term government-wide contracts with commercial companies that provide access to commercial products and services at fair and reasonable prices to the government.  "Schedule 70 contracts"

provide IT solutions, services, and software to federal, state, and local customer agencies. GSA pre-negotiates the vendors' pricing, terms, and conditions, to streamline the acquisition process while at the same time providing the best value to the end user agency.

10.     GSA issued SIMPKINS a Dell Latitude E7450 laptop computer, Service Tag 18M8282, GSAID A006791, for official business purposes, that is the "GSA LAPTOP. According to GSA device management records, SIMPKINS was assigned the GSA LAPTOP as early as April 14, 2016.

11.     Additionally,     GSA     issued     SIMPKINS     an     email     account, Ronnie.Simpkins@gsa.gov, for official business purposes (hereinafter "SIMPKINS GSA email"). SIMPKINS worked from his residence, most recently 673 Santa Fe Trail, Lusby, MD, four business days each week, and reported to the GSA office located in the District of Columbia every Tuesday.

12.     **International Development & Resources, Inc.** (hereinafter "IDR") is an IT company located at 14641 Lee Highway, Suite D8, Centreville, VA 20121.  IDR has had an office at this location since September 4, 2009.  The company's website, idrnet.com, lists the address as its "corporate headquarters" and includes a link entitled: "GSA Schedule," which emphasizes for prospective customers that the company was awarded a GSA Scheduled contract, GS-35F-4602H. Advertising its GSA Schedule status may benefit IDR when it seeks contracting opportunities with other federal agencies, as those agencies may consider IDR's GSA status and GSA pricing in fashioning their own contracts.

13.     **Mary T. Hay** (hereinafter "HAY") is IDR's founder, CEO and President. According to law enforcement database search results for the Virginia Department of Motor

Vehicles (DMV) and open source information, HAY resides at 7509 Bull Run Drive, Centreville, VA 20121 (hereinafter "HAY residence").

14.     **Dr. James Rivera** (hereinafter "RIVERA") is IDR's Vice President.   According to VA DMV records, RIVERA also resides at HAY's residence.

15.     **Lani Hay** (hereinafter "L. HAY") is the daughter of Mary Hay and was the owner and operator of two companies, Blak Lava and Lanmark Technologies, Inc., that had their own GSA Schedule contracts.  GSA records reflect that Blak Lava's GSA contract (GS-35F-0079W) was cancelled on or about December 31, 2016, due to a lack of sales for a period of twelve quarters.

16.     Since at least 2010, to the date of his retirement, SIMPKINS was the GSA contracting officer assigned to IDR.

## PROBABLE CAUSE

As set forth below, there is probable cause to believe that HAY and RIVERA paid SIMPKINS, or provided him with other items of value, including meals, entertainment and furniture, to take official action on behalf of IDR, and L. HAY and her companies, to preserve their GSA Schedule status, despite their failure to meet the annual minimum sales threshold.

I.     IDR's GSA Contract

17.     On October 1, 1997, GSA awarded IDR contract GS-35F-4602H.  Under that contract, IDR offered various services including IT training, IT professional services, and electronic commerce services.

18.     On August 19, 2017, GSA awarded IDR contract GS-35F-628GA, which replaced the prior contract.  IDR continued to offer IT related services under the new contract.[1]

19.     SIMPKINS had administered and overseen IDR's GSA contracts for over nine years, beginning on or about June 3, 2009.  SIMPKINS' duties included executing contract modifications and ensuring contract compliance.

20.     To maintain a GSA Schedule contract, IDR was required to have annual sales in excess of $25,000.  GSA Schedule contracts are subject to cancellation if sales levels are not met.  The annual sales requirement can be waived by the GSA Administrative Contracting Officer ("ACO") for good cause after communicating with the contract vendor.  If the contract vendor can demonstrate that it has potential, pending or unreported sales, the ACO normally will allow the contract to continue and withdraw the contract cancellation.

21.     Contractors, such as IDR, are required to pay an Industrial Funding Fee ("IFF") of 0.75% of all Schedule sales.  The IFF is a fee to cover GSA's cost of operating the Federal Supply Schedules program.

22.     IDR has maintained its GSA Schedule contract despite reporting no sales and not paying any IFFs since 2006.

II.     The Anonymous Complaint

23.     On June 11, 2017, GSA-OIG received an anonymous hotline complaint about SIMPKINS.  The complainant alleged that SIMPKINS was "taking kickback money so that a contract can get approved for Mary T. Hay and James Rivera at IDR, Inc. (sic)."  The complainant further alleged that it had observed SIMPKINS meeting with HAY and RIVERA in March 2017,

---

[1] IDR does a substantial amount of business with government agencies outside of their GSA Schedule contracts. Since 2006, IDR has sold approximately $269,041,780 worth of IT related services and training, primarily to the Department of Defense, the Department of Health & Human Services (HHS), and the National Institute of Health (NIH).

and again in June 2017, at a restaurant in Centreville, Virginia, and at which the IDR contract approval was discussed.  The complainant reported that HAY said she would send SIMPKINS the paperwork to approve the contract and HAY gave SIMPKINS an "envelope of money" for helping them (HAY and RIVERA) to obtain contract approval.   The complainant advised GSA-OIG to check SIMPKINS' work email for proof of the information it provided.[2]

24.     Based on the specific anonymous allegations, GSA-OIG initiated an investigation with the assistance of the FBI.

III.     SIMPKINS' Contacts with HAY and RIVERA

25.     The investigation has revealed that beginning in or around February 2010, and continuing through in or around August 2017, SIMPKINS met RIVERA and/or HAY over a dozen times at various restaurants in Centreville, VA; at HAY's residence; and at the Kennedy Center in Washington, D.C.  The meetings often occurred outside of normal GSA business hours and on weekends. These meetings sometimes followed or preceded SIMPKINS taking official action or providing improper assistance on IDR's GSA Schedule contracts.   Several times the meetings coincided with cash deposits in SIMPKINS' bank accounts.  A few examples of such are as follows:

*February 2011 – Copper Canyon Grill*

26.     On February 13, 2011, C.B.'s Number -9618 received approximately six incoming calls from HAY's phone and three calls from IDR's number.

---

[2] GSA OIG has identified the anonymous complainant as C.B., a person who was romantically involved with SIMPKINS during at least part of the period, approximately 2007 through at least 2016, when it claimed that SIMPKINS took payments from HAY and RIVERA.  Telephone and email records reviewed during the investigation have corroborated the suspected identity of the anonymous complainant.  Additionally, a law enforcement database search of the name C.B. resulted in cellular numbers ending in -9618 (hereinafter "C.B.'s Number -9618") and -1935 (hereinafter "C.B.'s Number -1935") that were used to communicate with HAY and RIVERA.

27.     On Saturday, February 26, 2011, RIVERA used his IDR corporate American Express card ending in -61002 (hereinafter "AMEX 1") to make a purchase totaling $363.48 at Copper Canyon Grill in Centreville, Virginia.

28.     On the same day, C.B.'s Number -9618 made an outgoing call to IDR's number and approximately four calls were exchanged between C.B.'s Number -9618 and RIVERA's phone.

29.     Three days later, on March 1, 2011, SIMPKINS deposited $900 in cash into his personal checking account ending in -8705 at Navy Federal Credit Union (hereinafter "NFCU"). Prior to the deposit, SIMPKINS' account balance totaled approximately, $145.68.   Thereafter, SIMPKINS initiated approximately $709 in expenditures and payments.   According to NFCU loan statements, during this period, SIMPKINS was past due on a loan account ending in -923-02.

30.     On March 7, 2011, SIMPKINS sent an email from his GSA email account to RIVERA's IDR email, stating "Again thanks for everything. I've reviewed the proposal. It's fine, however the following attachment are (sic) needed to complete the package when the package is submitted."

*September 2012 – Bonefish Grill*

31.     On September 6, 2012, C.B.'s Number -1935 made an outgoing call to Rivera's phone.

32.     On September 11, 2012, GSA notified Blak Lava, a company owned by L. HAY that its contract (GS-35F-0079W)[3] was in jeopardy because it did not have any Schedule sales. L. HAY is the CEO of Blak Lava, as well as, the CEO of a company called, Lanmark Technology Inc. (hereinafter "LMT").  LMT also has a contract with GSA.[4]  L. HAY forwarded the GSA notice email to RIVERA's and HAY's IDR email accounts and stated, "Do you think this is something Ron Simpkins can help with? I currently do not have any GSA contracts in the works for Blak Lava, so I'm not sure if he can intervene and prevent it from being cancelled."

33.     On September 21, 2012, Rivera's phone made an outgoing call to C.B.'s Number -1935.

34.     On Saturday, September 22, 2012, Rivera's phone made two outgoing calls to C.B.'s Number -1935.

35.     On Sunday, September 23, 2012, RIVERA using his IDR email account, responded to L. HAY, copying MARY HAY's IDR email, and stating, "We have been working back and forth with Mr. Simpkins (in your Mom's way) on the formation of the attached letter. You need to (1) put a point of contact on the bottom of the letter, (2) put the letter on Blak Lava letterhead, and

---

[3] Blak Lava contract GS-35F-0079W was given a starting date of November 6, 2014, through an end date of November 5, 2019.

[4] LMT contract GS-35F-0827M was given a starting date of September 25, 2012, through an end date of September 24, 2017.

(3) have the Blak Lava President, CEO sign the letter. Email to Mr. Simpkins TODAY-very important that he gets the letter before tomorrow."

36.     Continuing on Sunday, September 23, 2012, HAY obtained the letter via email and forwarded it to SIMPKINS' GSA email account, stating, "Attached is the letter from Blak Lava, please review and I will call you in (sic) this matter"

37.     There were approximately five outgoing/incoming calls exchanged between Rivera's phone and C.B.'s Number -1935 on September 23, 2012.

38.     That day SIMPKINS also made several changes to the Blak Lava letter and emailed it back to HAY, copying RIVERA.

39.     On Saturday, September 29, 2012, C.B.'s Number -9618 made an outgoing call to Rivera's phone.

40.     Later that day, Rivera's AMEX 1 card reflected a purchase totaling $271.07 at Bonefish Grill in Centreville, Virginia.

41.     Two days later, on October 1, 2012, SIMPKINS deposited $600 in cash into his NFCU bank account ending in -8705.  Prior to the deposit, SIMPKINS' account balance totaled approximately, $270.68.   Thereafter, NFCU bank records revealed SIMPKINS initiated approximately $363.30 in expenditures and payments.

42.     The following day, October 2, 2012, SIMPKINS deposited another $50 in cash into the same NFCU bank account. Prior to the deposit, SIMPKINS' account balance totaled approximately, $507.38.   Thereafter, NFCU bank records revealed SIMPKINS initiated approximately $565.01 in expenditures and payments.

*November 2015 – Carrabba's*

43.     On Monday, September 21, 2015, an ACO for GSA sent an email to RIVERA's IDR email notifying him that GSA was considering cancelling IDR's Schedule contract for failure to have any sales under the contract.  The ACO specifically directed RIVERA "*not [to] contact your previous Contracting Officer at this time*" (emphasis added).

44.     RIVERA ignored the ACO's directive and on the same day that RIVERA received the cancellation notice, there were approximately three calls exchanged between RIVERA's phone and SIMPKINS' GSA phone.  Additionally, RIVERA forwarded the email from the ACO to SIMPKINS' GSA email account.   SIMPKINS replied to RIVERA and advised him that IDR needed to submit a letter to GSA requesting that GSA consider IDR's unreported or pending future sales to meet the annual $25,000 threshold.  RIVERA'S response to the ACO included language that attempted to provide an explanation why the company did not meet the sales requirement.  In his email, RIVERA stated IDR was "proactively marketing its capabilities and services, as well as, responding to various GSA IT opportunities," however, due to the amount of time the federal procurement process took and/or the amount of modifications to an original plan, IDR was unable to meet the threshold.  RIVERA attached a letter addressed to the ACO and requested GSA consider "keeping the contract [GS35F4602H] alive" because IDR was pursuing several GSA opportunities such as, RFQs (#1031829 and #1041917).[5]

---

[5] According to open source, a Request for Quotation (RFQ) is defined as a standard business practice whose purpose is to invite suppliers into a bidding process to bid on specific products or services.  RFQs may be used in negotiated procurements to communicate government requirements to prospective contractors. A quotation received in response to an RFQ is not an offer, and consequently, cannot be accepted by the government to create a binding contract.  The order is an offer by the government to the supplier to buy certain supplies or services upon specified terms and conditions. A contract is established when a supplier accepts the offer.

45.    On Tuesday, October 6, 2015, SIMPKINS sent an email from his GSA email account to RIVERA's and HAY's IDR email accounts, stating, "…*you were not supposed to contact me*" (emphasis added) and directing them "not [to] attach [his] emails to…the emails you send to the ACO."  SIMPKINS further advised RIVERA and HAY, "not to use the exact wording that I give you, try to change some of the wording.  If you do not follow my help the ACO may recognize the wording from me. Thanks."

46.    There also were approximately three outgoing/incoming calls between RIVERA's phone and SIMPKINS' GSA phone on October 6, 2015.

47.    On Thursday, October 8, 2015, SIMPKINS' GSA phone made an outgoing call to RIVERA's Phone.  RIVERA sent an email from his IDR email account to SIMPKINS' GSA email account and to HAY's IDR email account, thanking SIMPKINS for his "guidance" in helping IDR stay on the GSA Schedule.   RIVERA included in the email a copy of the language from the notification letter IDR received, stating "[T]he Procuring Contracting Officer has determined that IDR has demonstrated efforts to meet the Contract Sales Criteria.  Therefore IDR will be permitted to continue with its Federal Schedule Contract as per the discretion of your contracting officer [Ronnie Simpkins]."

48.    On Thursday, October 22, 2015, SIMPKINS sent an email from his GSA email account to RIVERA's and HAY's IDR email accounts, stating, "*We made it thru [another year without reported sales], now it's time for the new offer for another 20 year contract with GSA. Give me a call when your (sic) ready to discuss the new offer*" (emphasis added).

49.    On Wednesday, November 11, 2015, RIVERA's phone made an outgoing call to SIMPKINS' GSA phone.

50.     On Friday, November 13, 2015, RIVERA sent an email from his IDR email to SIMPKINS' GSA email account and HAY'S IDR email, stating "The address is as follows: Carrabba's Italian Grill, 5805 Trinity Pkwy, Centreville, VA 20120." SIMPKINS replied, "Got it thanks."

51.     On Sunday, November 15, 2015, RIVERA's IDR AMEX card ending in -62000 (hereinafter "AMEX 2") reflected a purchase totaling $235.64 charge at Carrabba's in Centreville, VA.

52.     On Thursday, November 19, 2015, SIMPKINS deposited $1,500 cash into his NFCU bank account ending in -8705.

*July 2016 – Bonefish Grill and Sears Hometown*

53.     On Monday, June 20, 2016, RIVERA's Phone made an outgoing call to SIMPKINS' GSA Phone.

54.     On Thursday, June 23, 2016, RIVERA's Phone made an outgoing call to SIMPKINS' GSA Phone, which lasted for approximately 28 minutes.

55.     On Wednesday, June 29, 2016, HAY sent an email from her IDR email account to SIMPKINS at his GSA email account and to RIVERA's IDR email, stating, "Can you meet with us Friday at 12:00 noon or Saturday at 3:00 pm?"

56.     On Thursday, June 30, 2016, RIVERA withdrew $4,000 cash from his PNC bank account ending in -5256; and RIVERA's Phone made an outgoing call to SIMPKINS' GSA Phone.

57.     On Sunday, July 3, 2016, RIVERA's American Express credit card ending in -21007 ("AMEX 3") reflected a purchase of $289.95 at the Bonefish Grill in Centreville, Virginia.

58.     Also on July 3, 2016, RIVERA used AMEX 3 to purchase $2,358.91 of furniture at Sears Outlet, 6365 Multiplex Drive, Centreville, Virginia, located in the same plaza as the Bonefish Grill.

59.     The Sears receipt reflects that the furniture was to be delivered to SIMPKINS at his home in Maryland.[6]   RIVERA used his personal email address, riverajrr@comcast.net, to send a copy of the Sears receipt for the furniture to SIMPKINS' GSA email account, stating,  "Note the delivery information below for 7/9/2016 – call us if you have any questions."

60.     On Wednesday, July 6, 2016, SIMPKINS replied to RIVERA, "Again as always, thank you ever so much. Talk to you soon."

61.     On Saturday, July 9, 2016, the expected arrival date of the furniture, SIMPKINS used his GSA phone to communicate with the Sears Outlet at phone number 703-631-3984, approximately eight times.  SIMPKINS also used his GSA phone to call the Sears Outlet on July 12, 16, and 22, respectively.

62.     On Wednesday, July 20, 2016, a copy of a Penske truck rental reservation was sent to SIMPKINS' GSA email account.  It reflected an expected pick-up date of (Saturday) July 23, 2016, from a local Home Depot store in Randallstown, MD.

63.     Five photographs of large boxes placed in the rear of a rental truck containing the Penske logo were found on SIMPKINS' GSA phone.[7]  The geolocation information contained in the photographs indicate that the pictures were taken on "7/23/2016" at approximately "9:44:43 AM" from the parking lot adjacent to Sears Hometown in Centreville, Virginia.

---

[6] Public records reflect that SIMPKINS purchased a single-family home on May 18, 2016, for $229,900 in Lusby, MD.

[7] In August 2017, GSA requested SIMPKINS turn over his GSA-issued cellphone for a routine update and at that time his phone was imaged in connection with this investigation.

64.     The Penske truck rental agreement indicates that SIMPKINS provided his driver's license to Home Depot when he picked up the truck on July 23, 2016.  The truck was picked up at approximately 6:49 AM from the Home Depot, in Randallstown, MD and was returned on the same date at approximately 7:21 p.m.

*August 2017 – Bonefish Grill*

65.     On Tuesday, August 15, 2017, RIVERA made two cash withdrawals in the amounts of $47,500 and $9,600 from PNC account ending in -5256.  The cash withdrawal ticket for the transaction totaling $9,600, contained handwritten notes next to the signature line that instructed the teller to divide the total amount into specific cash denominations.

66.     On Friday, August 18, 2017, SIMPKINS sent an email from his GSA email account to RIVERA's and HAY's IDR email accounts, stating, "Hope all is well and I hope that you're (sic) health has improved as well Dr. Jim. This email is to notify IDR that you're (sic) new IT 70 contract is ready for your signature."

67.     On August 19, 2017, GSA awarded IDR a new Federal Supply Schedule contract, GS-35F-628GA, with a beginning date of August 19, 2017, and an ending date of August 18, 2022, notwithstanding that it had not made any sales nor paid any IFF to GSA since 2006.

68.     On Saturday, August 26, 2017, RIVERA's American Express credit card ending in –22005 ("AMEX 4") reflected a purchase totaling $350.95 at the Bonefish Grill in Centreville, Virginia.

69.     That day, RIVERA's phone made an outgoing call to SIMPKINS' GSA phone. Cellular telephone records for SIMPKINS' GSA phone indicated that SIMPKINS' phone was within one mile of the Bonefish Grill in Centreville, Virginia at the time of the call.

70.     On Wednesday, August 30, 2017, SIMPKINS deposited $2,000 in cash into his NFCU account ending in -8705.

IV.     SIMPKINS' Financial Disclosure Reports

71.     As a condition of his employment, SIMPKINS is required to submit an annual OGE Form 450 – Confidential Financial Disclosure Report.  Between 2012 and 2019, SIMPKINS did not report any additional sources of income, outside of his GSA salary, on his filed OGE 450 forms.  Furthermore, SIMPKINS failed to report the furniture purchased by RIVERA on his 2016 OGE Form 450, which was required because the cost exceeded the reporting threshold of $350.

V.     SIMPKINS' Interviews – May 2019

72.     On May 16, 2019, the affiant, along with FBI Special Agent Rosemaria Marketos, interviewed SIMPKINS at his residence.  During the initial part of the interview, SIMPKINS denied knowing the full names of HAY and RIVERA and was unable to recall the name of the President/CEO of IDR.  SIMPKINS also said that he had not spoken with HAY or RIVERA for months.  SIMPKINS denied ever receiving cash and/or gifts, to include furniture, from HAY or RIVERA.

73.     After being confronted with the evidence against him, SIMPKINS later admitted that he had dinner around August 2011, at HAY's and RIVERA's residence.  He also admitted that on July 3, 2016, he met with HAY and RIVERA at either Bonefish restaurant or Carraba's restaurant, in Centreville, VA.  SIMPKINS claimed that during the lunch while discussing the recent move into his residence, HAY and RIVERA told him they wanted to purchase the furniture for him.  SIMPKINS admitted it was his idea to go to the Sears Outlet store.  SIMPKINS also admitted he picked up the furniture from Sears on July 23, 2016, because the store would not deliver to his residence.

74.     SIMPKINS later admitted that he received approximately fifteen cash payments totaling approximately "thousands of dollars into the teens" from HAY and RIVERA.  SIMPKINS said that he received the cash payments in an envelope during their scheduled lunches and dinners. SIMPKINS claimed that the amounts of cash in the envelopes were pre-determined by HAY or RIVERA and he would only see the amounts when he would open the envelope after the meals. Furthermore, SIMPKINS described seeing different denominations of cash for example, 20s, 50s, and 100s.

75.     SIMPKINS further stated that he used the money received from HAY and RIVERA for everyday living expenses including, but not limited to, vehicle repairs and for his grandchildren.

76.     SIMPKINS also met with the FBI on May 20 and 21, 2019.  He was scheduled to meet with the FBI again on or about May 28, 2019, but he canceled that meeting and abruptly resigned from GSA.

VI.     SIMPKINS' Retirement

77.     On May 16, 2019, the same day that he first met with the FBI, SIMPKINS contacted the GSA Office of Human Resources Management (OHRM) to ask where to mail his retirement package.  SIMPKINS informed OHRM that he planned to retire on June 28, 2019.

78.     On May 28, 2019, OHRM received SIMPKINS' retirement package, which listed his retirement date as June 28, 2019.

79.     On or about May 28, 2019, SIMPKINS informed the FBI that he would no longer meet with them.

80.     On May 29, 2019, GSA-OIG learned through the GSA Office of Human Resources Management (OHRM) that on May 28, 2019, SIMPKINS mailed a new retirement package

17

overnight to OHRM.  OHRM received SIMPKINS' new retirement package on May 29, 2019, and

SIMPKINS listed his retirement effective May 28, 2019.  As such, GSA OHRM advised that

SIMPKINS was officially retired.

VII.       SIMPKINS' GSA LAPTOP

81.       On May 28, 2019, GSA-OIG agents seized the GSA LAPTOP from SIMPKINS at

his work station in GSA Headquarters.

82.       According to the most recent GSA Information Technology (IT) Security Policy

dated January 14, 2019, all GSA IT systems must contain a warning banner to all users attempting

to access GSA computer systems.  This warning banner states,

> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*WARNING\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> This is a U.S. General Services Administration Federal Government
> computer system that is "FOR OFFICIAL USE ONLY." This system is
> subject to monitoring.    Therefore, no expectation of privacy is to be
> assumed.   Individuals found performing unauthorized activities may be
> subject to disciplinary action including criminal prosecution.

83.       The GSA IT security policy also states users may occasionally make personal use

of email and social media that involves minimal expense to the Government and does not interfere

with Government business.

84.       GSA training records indicate SIMPKINS completed GSA's online "2019 GSA

Mandatory Cyber Security and Privacy Training" on May 6, 2019.  Included in the "Privacy"

section of the course was the following: "Users have no expectation of privacy on GSA IT

resources since all activities are subject to monitoring."

**PROBABLE CAUSE TO BELIEVE THE GSA LAPTOP CONTAINS RECORDS,
INFORMATION AND EVIDENCE CONCERNING THE CRIMINAL CONDUCT**

85.       GSA issued the GSA LAPTOP to SIMPKINS for GSA official business.

18

86.     SIMPKINS primarily communicated with HAY and RIVERA using his GSA email account, the GSA LAPTOP, and a GSA-issued cellular telephone.

87.     Specifically, a review of SIMPKINS', HAY's and RIVERA's email correspondence and documents attached thereto, revealed that SIMPKINS used the GSA LAPTOP and his GSA email account to conduct GSA business with IDR and to communicate with HAY and RIVERA.  Accordingly, there is reason to believe that the GSA LAPTOP may contain business records, such as the IDR-GSA contracts, communications between IDR and GSA, financial documents (e.g., bank statements), sales and services contracts for IDR's purported clients on the GSA contract or confirmation that no such customers existed, communications between the subjects about the GSA contract, drafts of documents and correspondence, as well as other evidence, fruits, instrumentalities or contraband concerning the alleged criminal conduct.

## TECHNICAL TERMS

88.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited

to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.   Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.   When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling

20

voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

      d.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant

client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l. "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n. "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred

between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time.   Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

       (i)     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

       ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

       o.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.   This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."   The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

       p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption

scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

89.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the GSA LAPTOP, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the GSA LAPTOP for at least the following reasons:

a.      Individuals who engage in fraudulent criminal activity, including government contracting fraud, use digital devices, such as laptop computers, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store documents and records relating to their illegal activity, which can include logs of online chats with co-

26

conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; to store contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; and to store financial data, including bank account numbers and credit card numbers.  Further, as stated above, the investigation revealed that SIMPKINS used the GSA LAPTOP to communicate with his HAY and RIVERA, as well as to prepare and transmit documents and information concerning IDR's GSA contracts and L. HAY'S GSA contracts.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, often will "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via

the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

90.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the GSA LAPTOP at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the GSA LAPTOP, not currently associated with any file, can provide

evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.   Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.      I know that when an individual uses a digital device to commit fraud, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

91.          Based upon my training and experience and information related to me by

agents and others involved in the forensic examination of digital devices, I know that:

a.          Searching digital devices can be an extremely technical process, often

requiring  specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today.  Digital

devices, such as laptop computers, may be customized with a vast array of software programs

and applications, each generating a particular form of information or records and each often

requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to

consult with specially trained peronnel who have specific expertise in the type of computer,

software application or operating system that is being searched, and to obtain specialized

hardware and software solutions to meet the needs of a particular forensic analysis.

b.          Further, as discussed above, evidence of how a digital device has been

used, the purposes for which it has been used, and who has used it, may be reflected in the

absence of particular data on a digital device.  For example, to rebut a claim that the owner of a

digital device was not responsible for a particular use because the device was being controlled

remotely by malicious software, it may be necessary to show that malicious software that allows

someone else to control the digital device remotely is not present on the digital device.  Evidence

of the absence of particular data or software on a digital device is not segregable from the digital

device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular

data or software requires specialized tools and a controlled laboratory environment, and can

require substantial time.

c.          Searching computer systems requires the use of precise, scientific

procedures which are designed to maintain the integrity of the evidence and to recover "hidden,"

31

erased, compressed, encrypted or password protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

d.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users also can attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

e.      Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by

new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system also may keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

    f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

### SEARCH METHODOLOGY TO BE EMPLOYED

  92.  In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

33

a.      The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the GSA LAPTOP will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SERCH AT ANY TIME OF THE DAY OR NIGHT

93.      Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **<u>CONCLUSION</u>**

94.      I submit that this affidavit supports probable cause for a warrant to search the GSA LAPTOP described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


_____
Patrick S. McCarthy, Special Agent
General Services Administration-Office of
Inspector General


Subscribed and sworn to before me on _____, 2019


_____
UNITED STATES MAGISTRATE JUDGE